1
2
3
4
5
6
7

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| ELIZABETH M. SAWYER, | **Case No. 1:14-cv-1124-EPG** |
| Plaintiff, | **ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT** |
| v. | |
| CAROLYN W. COLVIN, Acting Commissioner of Social Security | |
| Defendant. | |

## I.  INTRODUCTION

Plaintiff, Elizabeth M. Sawyer ("Plaintiff"), seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for Supplemental Security Income ("SSI") benefits and Disability Insurance Benefits ("DIB") pursuant to Titles II and XVI of the Social Security Act.  The matter is currently before the Court on the parties' briefs, which were submitted without oral argument to the Honorable Erica P. Grosjean, United States Magistrate Judge.[1]  Upon a review of the administrative record, the Court finds the ALJ's decision is not supported by substantial evidence, and the case is remanded to the agency for further proceedings.

///

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge. (Doc. 6 and 9).

**II.     BACKGROUND AND PRIOR PROCEEDINGS**[2]

Plaintiff filed her first applications for DIB and SSI in November 2008, alleging a disability onset date of September 30, 2007.  Both applications were denied initially and on reconsideration in October 2009.  AR 20. On October 21, 2010, Plaintiff filed other applications for DIB and SSI, alleging disability as of September 3, 2007 based on bipolar personality disorder, four herniated discs, depression, and panic and anxiety disorder. AR 20; 76; 207-221; 245, 249.  Her applications were denied initially on February 14, 2011, and on reconsideration on August 23, 2011.  AR 76-131.  A hearing was conducted before Administrative Law Judge ("ALJ") Danny Pittman on February 28, 2013.  AR 39-75.  Plaintiff and a vocational expert testified.  *Id.*  Plaintiff was 39 years old at the time of the hearing. AR 41. She has a high school diploma and is a licensed nurse's assistant. AR 44.  She worked as a nurse's aide in the past, and most recently worked in 2012 or 2013, although the ALJ found she had not engaged in substantial gainful activity since September 2007, the date of Plaintiff's alleged disability. AR 22; 44-45.

On March 28, 2013, the ALJ issued an unfavorable decision finding that Plaintiff was not disabled. AR 20-30. Plaintiff filed an appeal of the decision with the Appeals Council. AR 15. The Appeals Council denied her appeal, rendering the order the final decision of the Commissioner. AR 1-3.

Plaintiff now challenges that decision, arguing that: (1) the ALJ failed to take into account all of Plaintiff's mental limitations when formulating the RFC; (2) the ALJ erred because he did not order a consultative evaluation of Plaintiff's physical impairments, and as a result, the record was not thoroughly developed; and (3) the ALJ's credibility analysis is flawed.  (Doc. 16, pgs. 15-25). Plaintiff argues that the Court should reverse and remand with instructions to award benefits.  In the alternative, the case should be remanded for further administrative proceedings. In opposition, Defendant argues: (1) that the ALJ's RFC properly encompassed all of  Plaintiff's mental impairments and is supported by substantial evidence; (2) the ALJ properly developed the medical record; and (3) ALJ correctly rejected Plaintiff's testimony. (Doc. 17, pgs. 10-15).

///

---

[2] References to the Administrative Record will be designated as "AR," followed by the appropriate page number.

**A. Medical Record**

Ms. Sawyer has received treatment for both mental and physical impairments including depression, anxiety, bipolar disorder, obesity, pelvic organ prolapse, polycystic ovary syndrome, urinary incontinence, irritable bowel, diabetes mellitus type II, asthma, lateral epicondylitis, arthritis of the right knee, and degenerative disc disease of the lumbar and cervical spine.  The entire medical record was reviewed by the Court, however, only evidence that relates to the issues raised in this appeal is summarized below.

*i. Summary of Treatment Records for Plaintiff's Mental Impairments*

Plaintiff received treatment at Dartmouth Hitchcock Medical Center for a variety of medical issues including depression and anxiety. AR 433-499; 596-826; 859-1025.  In 2004, she was diagnosed with depression and responded well to Prozac. AR 498, 494. However, by September 2007, Plaintiff's depression and anxiety worsened after her husband attempted suicide. AR 493; 491; 647.  Her doctor granted her a leave of absence from work. AR 493. In October 2007, her anxiety and depression was controlled, but her work leave was extended. AR 486.  She was referred to mental health counseling, diagnosed with a mood disorder, and was assessed with a GAF of 55.[3] AR 638.

In November 2007, Plaintiff's anxiety improved, but continued treatment for her depression was recommended. AR 484. On examination, she did not appear to be especially depressed or anxious. She had episodic suicidal ideation with thoughts of overdosing. Judgment and insight were poor to fair and her GAF was 50.  Her medications were reviewed and she was strongly advised to begin psychotherapy. AR 644, 645. The doctor also noted improvement on medications.  AR 645.

By July 2008, Ms. Sawyer was not taking her medications. She was experiencing more

[3] The GAF scale is a rating from 0 to 100 and considers psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness. *Diagnostic and Statistical Manual of Mental Disorders*, 32-35 (4th ed. American Psychiatric Association 1994). A GAF of 21-30 corresponds to behavior that is considerably influenced by delusions or hallucinations, or serious impairment in communication or judgment, or an inability to function in almost all areas. *Id.* A GAF of 31- 40 corresponds to some impairment in reality testing or communication, or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *Id.* A GAF of 41-50 corresponds to serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* A GAF of 51-60 corresponds to moderate symptoms or moderate difficulties in social, occupational, or school functioning. *Id.*

panic attacks and anxiety, as well as difficulty sleeping. AR 336. After restarting medications, she was still quite anxious and depressed, but her anxiety was a little better. By September 2008, she had quit her job, separated from her fiancé, and moved in with her parents. She had occasional thoughts of suicide, but no plan. AR 335. After starting Depakote a few weeks later in September 2008, her condition improved. However, she continued to have some suicidal ideation. AR 333; 334.

In January 2009, Amitriptyline was added to Ms. Sawyer's treatment regimen to help with her sleep. AR 413.  It was noted that her depression had been a recurrent pattern for years, but its "course ha[d] been decreasing." AR 414.  Nonetheless, Plaintiff continued to experience episodes of spontaneous crying and feeling tired.  She also had a lack of energy and suicidal thoughts. AR 414. Her depression was partially improved with current therapy, but further treatment was needed. AR 413-414.

By mid-July 2009, Plaintiff's primary care doctor referred her to the emergency room for suicidal ideations as a result of family stressors.  She was subsequently referred for therapy. AR 570.  Later in July 2009, her depression and anxiety were "clearly much better," and she got a new job in August 2009. AR 473; 592.

In September 2009, she was assessed with mood disorder, but her mood swings and elevated mood did not support a diagnosis of bipolar disorder. AR 676. Instead, her symptoms were largely due to poor affect recognition, poor affect tolerance, and a limited range of coping skills. AR 676. Her diagnosis was depression, dysthymia complicated by episodic depression, rule out bipolar disorder, and very significant social stressors. Her GAF was 49. AR 676.

Later in September 2009, Ms. Sawyer's depression and anxiety overall felt substantially better and she denied suicidal ideation. AR 467. She scored poorly on the PHQ9 (patient health questionnaire-9), but was doing better than suggested as some of her symptoms were related to sleepiness and fatigue. Sleep apnea was suggested. AR 470.  By October 2009, her GAF was 55. AR 547-548. She was separated from her longtime partner and seeing someone new. AR 685.

In January 2010, Ms. Sawyer's life situation and depression had stabilized. AR 459; 685. Her irritability was considered personality related. AR 695. She had some issues with her work

4

situation but she was developing coping strategies. AR 586. In April 2010, and she was working full time as a home/office cleaner. AR 456. She had moved in with her new boyfriend but their relationship was strained. AR 456, 771.

In October 2010, Ms. Sawyer continued her psychiatric treatment at the Clara Martin Center. Her diagnoses included PTSD and dysthymic disorder. AR 516. She needed to work on anxiety, depressive symptoms, and her trauma history. AR 542. She had suicidal intent, plan, access to means, and a history of suicidal ideation. AR 536. Her GAF was 50. AR 516. A few days later on October 10, 2010, her PHQ9 was the maximum, suggesting severe depression. She was referred for inpatient admission and was hospitalized for eight days at the Rutland Regional Medical Center for bipolar disorder with possible rapid cycling. AR 501; 784-785. She had thoughts of jumping off a gorge or cutting her wrists. Her discharge diagnoses were bipolar disorder, anxiety, obesity, and type II diabetes with a GAF of 45. AR 501.

In 2011, Ms. Sawyer continued therapy for her depression at the Clara Martin Center. She seemed more regulated and had no suicidal ideations in February (AR 852), but a week later, was extremely unregulated and crying. She reported being overwhelmed due to being in a car accident and other life stressors. AR 851. Her GAF was 55. AR 839.

In March 2011, she reported continuing anxiety, health issues, sleep difficulty, and being overwhelmed. AR 844. She was referred for a sleep study. She was working part-time for a cleaning agency. AR 849.

In April 2011, she was having financial problems and was looking for other jobs. AR 841. Her boyfriend asked her to leave and she was kicked out of housing. AR 842. She was discharged from the Clara Martin Center in May 2011. It was noted that she had improved with a GAF score of 56.  AR 832. In July 2011, she was depressed with intermittent suicidal ideation. AR 990, 985. Her mood was dysphoric, tearful, and her affect was constricted. AR 999. She then moved from Vermont to California. AR 1024.

Once in California, Ms. Sawyer was voluntarily admitted to Merced County Department of Health in September 2011 for depression. She had run out of medications for three weeks, was experiencing suicidal ideation, and had a plan. AR 1036. She was tearful and exhausted. AR

1036. She was discharged with bipolar disorder and a GAF of 50 with a prescription for

medication.  AR 1033.

Between September 2011 and February 2013, Plaintiff received counseling and medication

from Merced County Mental Health Services ("MCMHS"). AR 1026-1085. In November 2012,

Plaintiff had a good mood, appropriate affect, and intact judgment, though she reported auditory

and visual hallucinations. AR 1064. Throughout her treatment at MCMHS, Plaintiff experienced

mood swings, anxiety, and depression due to life stressors, and her medications were adjusted.

AR 1045-1046; 1058-1057.  However, on several occasions, Plaintiff reported good compliance

and response to medication. AR 1054, 1057, 1059, 1062.

In February 2013, at Plaintiff's wellness check and medication assessment, Plaintiff

reported that she "believes medications are effective at this time in controlling her symptoms."

AR 1068. Plaintiff reported that she was back to reading books and taking walks. AR 1068.

Plaintiff also reported good compliance and response to medication. AR 1068.

### ii. *Summary of Treatment Records for Plaintiff's Physical Impairments*.

In February 2008, Ms. Sawyer had right elbow pain and an MRI revealed lateral

epicondilitis. AR 651, 818. In May 2009, Ms. Sawyer was evaluated for knee pain. Her symptoms

included spasms, nighttime pain, and pain after walking two flights of stairs. AR 387. On

examination, she had some swelling, crepitus, and tenderness. AR 389. An MRI showed arthritis.

AR 389, 391, 406. After examination, she was referred for consideration of arthroscopic

evaluation and treatment. AR 391. However, on further evaluation, her doctor determined

surgical intervention would not improve her knee pain. Continued weight loss and physical

therapy was recommended. AR 389.

In April 2010, despite having lost close to 90 pounds, she was having low back pain with

sciatica to her left lower extremity. AR 703, 705, 706. She was sent to physical therapy in May

2010. AR 706. In July 2010, she had chronic lumbar pain and a spine center evaluation was

arranged. AR 456. She was considered a good candidate for bariatric surgery. AR 452.  Ms.

Sawyer continued with physical therapy. AR 776.

In September 2010, she was assessed as dealing with chronic mechanical low back pain

with left leg pain which appeared to follow a L3-L4 dermatomal pattern with a decreased knee reflex. AR 778. In October 2010, an MRI revealed degenerative disc disease from L2-L5 with central disc protrusions at L3-4 and L4-5, and with small amount of extruded material downward at L4-L5. The protrusions reduced the canal dimensions somewhat. There was a questionable amount of left sided signal abnormality behind the lower inferior portion of the body. AR 790, 821. Her diagnosis was mechanical low back pain that could be associated with disc protrusion. The MRI did not specifically indicate the cause of her pain. AR 790. Ms. Sawyer's doctor discussed surgery, but was not convinced she would be a candidate due to lack of clear pathology. AR 790. She was referred to physical therapy, pool therapy, or conditioning if needed. AR 790. She was also given a lumbar epidural steroid injection. AR 725.

In November 2010, Ms. Sawyer continued treatment for her low back pain. Physical therapy helped for a few days. She had no leg pain after her epidural but still experienced tenderness across the entire spine, as well as decreased sensation in the left leg. AR 737. She did not want further injections because they were not effective. A TENS unit was prescribed. AR 738.

In June 2011, Ms. Sawyer was diagnosed with herniated disc without myelopathy. AR 950. In addition to her low back pain with pain radiating down the left leg, she had neck pain with bilateral upper extremity radiculopathy and numbness in the arms and hands bilaterally. AR 892. An MRI of the cervical spine performed on June 30, 2011, revealed degenerative disc disease and uncovertebral osteophytes producing moderate bilateral C4-C5 and right C5-C6 neural foramen narrowing. She had central posterior disc extrusion at C4-C5 effacing the ventral subarachnoid space, but not compressing the spinal cord. AR 1008.

In July 2011, she received her third lumbar epidural injection. AR 958, 1019.  In August 2012, Ms. Sawyer continued to be morbidly obese despite a ten-pound weight loss. AR 1076.  In February 2013, she was assessed with left shoulder musculoskeletal strain. AR 1072.

### iii. Opinion Evidence

#### Dr. Skolnik, Psy.D., Consultative Examining Psychologist

Dr. Ben Skolnik Psy.D. performed a psychological assessment on April 6, 2009. AR 353. He found no overt disturbance with attention, concentration, or short-term memory, but he noted

Plaintiff had difficulty sleeping at times. Plaintiff's judgment and insight appeared poor, though she did not appear either significantly depressed or hypomanic. He ruled out bipolar II disorder and rated her GAF at 55. AR 358. He opined that it appeared she probably had bipolar disorder but her description of symptoms was possibly more of a state of mobility and anxiety rather than a true hypomanic state. AR 358.

*Dr. Hedgepeth, Ph.D., Consultative Examining Psychologist*

Dr. Ronald Hedgepeth, Ph.D., examined Ms. Sawyer on February 4, 2011. AR 828. He cited a history of depression and suicidal ideation, with one suicide attempt and one psychiatric admission. AR 829-830. Ms. Sawyer scored 30 out of 30 on the Mini-Mental Status Exam. AR 830. He found Plaintiff suffered from episodic depression, but she did not meet the criteria for PTSD, panic disorder, or bipolar disorder. Chronic interpersonal problems and affective instability were consistent with a diagnosis of borderline personality disorder. Dr. Hedgepeth diagnosed learning disorder (by applicant's report), depressive disorder, and borderline personality disorder and assessed a GAF of 60. AR 830.

Dr. Hedgepath opined Ms. Sawyer suffered from chronic adjustment difficulties related to depressive symptomatology and personality disorder. AR 831. There was no indication that her psychiatric symptoms would cause difficulty in understanding, remembering, and following instructions in the workplace. She preferred to work alone but had shown an ability to work effectively with others, e.g. elderly care. He opined she should be able to manage normal pressures of a workday.  AR 831.

*Dr. Joseph Patalano, Ph.D., Non-examining State Agency Psychologist*

As part of Plaintiff's first disability claim, Ms. Sawyer's file was reviewed on October 5, 2009 by Joseph Patalano, Ph.D. He found Plaintiff was moderately limited in all areas but had no episodes of decompensation. AR 435. He opined Ms. Sawyer was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors, but had no significant limitation in an ability to set realistic goals or make plans independently of others. Dr. Patalano concluded that Plaintiff could complete 3+ step tasks, but is limited from complex high stress tests due to low frustration tolerance associated with depression and anxiety personality

style.  He also noted she may have occasional problems with concentration and pace due to intermittent increases in anxiety/depression, which could temporarily undermine her cognitive efficiency. Otherwise, Plaintiff was capable of sustaining concentration, persistence and pace for two-hour periods over an eight-hour day. She was limited in tasks that require sustained stressful interaction with the public or many coworkers due to poor stress tolerance. She may also have some difficulty with critical evaluation due to defensive style. Plaintiff was capable of setting goals, recognizing hazards, traveling, and managing routine changes in a low stress work environment. AR 424.

*Other Non-examining State Agency Doctors*

As part of Plaintiff's first application, on May 13, 2009, Dr. William Farrell, Ph.D., completed a psychiatric review technique form and determined that Plaintiff was moderately limited in concentration, persistence, and pace. AR 379.  He opined she could complete three-step tasks in a low stress work environment.  He also found that although Plaintiff had relationship problems, she did not appear to have significant social limitations in the work place.  She may need some help planning and setting goals, however, there was not a twelve month period where she would be unable to work.  AR 368.

On August 12, 2011, state agency doctors reviewed the file in connection with Plaintiff's second application for disability and found that she had moderate limitations in her ability to understand, remember, and carry out detailed instructions. AR 84. Reviewers explained that Plaintiff was limited to understanding detailed 4+ step instructions, otherwise she would need to write them down. AR 84. She was moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms. AR 84. She was limited for high stress work settings because of episodic exacerbations in anxiety, and depressive symptoms could temporarily undermine her cognitive efficiency. Otherwise, it was determined that Plaintiff could sustain concentration, persistence, and pace for two hours in a low stress work setting. AR 84. She was moderately limited in her ability to respond appropriately to changes in the work setting, and could not tolerate frequent changes in routine. She could travel, set goals, but should avoid hazards. AR 85. These opinions were affirmed on August 12, 2011 by

William Farrell, Ph.D. AR 110-112, 124-126.

With regard to Plaintiff's physical impairments, on February 4, 2009, state agency reviewing physicians reviewed Ms. Sawyer's prior claim and determined that Ms. Sawyer could lift 50 pounds occasionally and 25 pounds frequently.  She should avoid even moderate exposure to fumes, odors, dusts, gases, poor ventilation, *etc*. AR 345-350. This assessment was affirmed in September 2009. AR 420. State agency reviewing physicians reviewed the file again on February 14, 2011. AR 83-85; 95-97. On August 12, 2011, Dr. Knisely, M.D., opined that Ms. Sawyer could lift 20 pounds occasionally and 10 pounds frequently; and that she could sit, stand, and walk six hours in an eight-hour day.   AR 110-11; 124-125.

**III.     THE DISABILITY DETERMINATION PROCESS**

To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. § 1382c(a)(3)(A).  An individual shall be considered to have a disability only if:

> . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability. 20 C.F.R. §§ 404.1502(a)-(f), 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.920(a)(4) and 404.1502(a)(4).  The ALJ must consider objective medical evidence and opinion testimony. 20 C.F.R. §§ 404.1527, 416.1529, 416.927, 416.929.

Specifically, the ALJ is required to determine:  (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had

medically-determinable "severe" impairments,[4] (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his or her past relevant work,[5] and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the regional and national level.  20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f).

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard.  AR 30.  In particular, the ALJ found that Plaintiff had not engaged in substantial gainful activity since September 3, 2007, the date her application was filed. AR 22.  Further, the ALJ identified degenerative disc disease, affective disorder, anxiety disorder, personality disorder, obesity, asthma, right knee degenerative joint disease, and right elbow partial tear of tendon as severe impairments. AR 23.  The ALJ also determined that Plaintiff did not have an impairment or combination of impairments that meets or equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. AR 23.

Based on a review of the entire record, the ALJ determined that Plaintiff had the RFC to lift and/or carry 20 pounds occasionally and 10 pounds frequently; sit, stand, and walk for 6 hours in an 8-hour workday; and that Plaintiff should avoid concentrated exposure to dust, gases, fumes, cold, wetness, and humidity. AR 24.  The ALJ also limited Plaintiff to simple routine tasks.  AR 24. Based on this RFC, the ALJ found that Plaintiff could not perform her past relevant work, but she could perform jobs that exist in the national economy, including a cashier, an office helper, and a packer.  AR 28-29.

**IV. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), this Court reviews the Commissioner's decision to determine

---

[4] "Severe" simply means that the impairment significantly limits the claimant's physical or mental ability to do basic work activities.  *See* 20 C.F.R. § 416.920(c).

[5] Residual functional capacity captures what a claimant "can still do despite [his or her] limitations." 20 C.F.R. § 416.945. "Between steps three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which the ALJ assesses the claimant's residual functional capacity." *Massachi v. Astrue*, 486 F.3d 1149, 1151 n. 2 (9th Cir. 2007).

1   whether:  (1) it is supported by substantial evidence; and (2) it applies the correct legal standards.

2   *See Carmickle v. Commissioner*, 533 F.3d 1155, 1159 (9th Cir. 2008); *Hoopai v. Astrue*, 499 F.3d

3   1071, 1074 (9th Cir. 2007).

4       "Substantial evidence means more than a scintilla but less than a preponderance."

5   *Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  It is "relevant evidence which,

6   considering the record as a whole, a reasonable person might accept as adequate to support a

7   conclusion."  *Id.*  "Where the evidence is susceptible to more than one rational interpretation, one

8   of which supports the ALJ's decision, the ALJ's conclusion must be upheld."  *Id*.

9   **V.      DISCUSSION**

10      **A.  The ALJ's RFC Regarding Plaintiff's Mental Impairment is Supported by
        Substantial Evidence.**

11      Plaintiff argues that the ALJ erred by failing to fully account for her mental impairments

12  in the RFC.  She contends that the ALJ found Plaintiff had moderate social limitations when

13  evaluating her mental impairments at step three in the disability analysis, but did not incorporate

14  any social limitations into the RFC.  Specifically, Plaintiff argues the ALJ gave weight to Dr.

15  Farrell's opinion -- who found Plaintiff required a low stress work setting, would be limited for

16  frequent changes in the routine, and would have exacerbations in anxiety or depressive symptoms

17  that could temporarily undermine her cognitive efficiency -- yet only limited Plaintiff to simple

18  repetitive tasks, which fails to address these limitations.  Finally, Plaintiff asserts that the ALJ's

19  rejection of Dr. Patalano's opinion on the basis that his assessment was completed in connection

20  with Plaintiff's prior claim was improper because Dr. Patalano's report is most consistent with the

21  medical record. (Doc. 16, pg. 15).

22      Defendant contends that the ALJ's mental RFC is supported by substantial evidence

23  because the ALJ determined that Plaintiff could perform simple repetitive tasks with no more

24  than superficial interaction, which adequately addresses all of Plaintiff's limitations.  Additionally,

25  Defendant argues that the ALJ gave the greatest weight to Dr. Hedgepeth's opinion who

26  determined that Plaintiff would not have difficulty understanding, remembering, and following

27  instructions in the workplace, and should be able to manage normal pressures of the workday.

28

Therefore, the ALJ's RFC was proper. (Doc. 17, pgs. 10-12).

### i. The ALJ's Findings

When evaluating Plaintiff's mental impairments, the ALJ outlined several of the doctor's opinion evidence. In relevant part, the ALJ noted as follows :

Regarding the other doctors' opinions, the ALJ noted the following:

> The claimant was seen by consultative psychologist Ben Skolnik in April 2009.  The claimant presented with a history of depression and anxiety, as well as physical complaints.  Her symptoms included insomnia, racing thoughts, pressured speech and spending sprees.  Dr. Skolnik noted her mood was euthymic, her judgment and insight were poor, and she was fully oriented.  She was diagnosed with rule out bipolar II disorder.  The doctor estimated that the claimant's global assessment of functioning (hereinafter "GAF") was 55, denoting moderate symptoms or moderate difficulty in social, occupational, or school functioning.

. . . . . . . . . .

> The claimant was seen by consultative psychologist Ronald Hedgepeth in January 2011.  The claimant presented with complaints of bipolar disorder, depression, panic disorder and anxiety.  The doctor noted the claimant was oriented times three, she was able to perform simple-three step commands, and her affect was full range and appropriate.  She was diagnosed with learning disorder, not otherwise specified (by claimant's report); depressive disorder, not otherwise specified; and borderline personality disorder.  Her GAF was assessed as 60, consistent with moderate symptoms or moderate difficulty in social, occupational, or school functioning.  Dr. Hedgepeth opined she would not have difficulty understanding, remembering and following instructions.

. . . . . . . . . .

> State agency psychologist William Farrell reviewed the claimant's medical record regarding her mental impairments and concluded she was capable of performing very short and simple instructions.

AR 27 (citations omitted).

With regard to giving weight to the physician's opinions, the ALJ noted the following :

> Dr. Skolnik conducted a detailed mental examination; however, he did not provide an opinion, beyond a GAF assessment.  Because the Commissioner stated these scores do not directly correlate with the []listing requirements, in this case, standing alone, I have given it little weight.  I give substantial weight to the opinion of Dr. Hedg[e]peth, which was based upon a thorough, well-documented examination.  Additionally, his opinion is supported by the bulk of

the medical evidence concerning the claimant's mental impairments.  The July 2011, opinion state agency William F[a]rrell is given weight.  It is consistent with that of Dr. Hedg[e]path.  I have given no weight to the opinions of [s]tate agency physician Ann Figar, M.D., and psychologist Joseph Patalano.  These opinions were in connection [with] the claimant's prior application, and therefore later received evidence was not considered.

AR 28 (citations omitted).

### ii.  Legal Standards for Medical Opinions

The opinions of treating physicians, examining physicians, and non-examining physicians are entitled to varying weight in disability determinations.  *Holohan v. Massanari*, 246 F.3d 1195, 1201; *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995), as amended (Apr. 9, 1996).  Generally, the opinion of a treating physician is afforded the greatest weight.  *Id.*  Similarly, the opinion of an examining physician is given more weight than the opinion of a non-examining physician.  20 C.F.R. § 404.1527(d)(2); *Pitzer v. Sullivan*, 908 F.2d 502, 506 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450 (9th Cir. 1984).  However, the opinions of a treating or examining physician are "not necessarily conclusive as to either the physical condition or the ultimate issue of disability."  *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).  "When there is conflicting medical evidence, the Secretary must determine credibility and resolve the conflict."  *Thomas*, 278 F.3d at 956–57; *see also Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992).

An ALJ may reject an uncontradicted opinion of a treating or examining medical professional only for "clear and convincing" reasons.  *Lester*, 81 F.3d at 831.  In contrast, a contradicted opinion of a treating or examining professional may be rejected for "specific and legitimate reasons that are supported by substantial evidence in the record." *Lester*, 81 F.3d at 830. For example, the ALJ may reject the opinion of an examining physician in favor of a conflicting opinion of another examining or treating physician if the ALJ makes "findings setting forth specific, legitimate reasons for doing so that are based on substantial evidence in the record."  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation and internal quotation marks omitted).  The ALJ can "meet this burden by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making

14

findings." *Id*. (citation and internal quotation marks omitted).

However, "the opinion of a nonexamining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of an examining or treating physician." *Morgan*, 169 F.3d at 602 (citations omitted).  The opinions of non-examining physicians may serve as substantial evidence when the opinions are "consistent with independent clinical findings or other evidence in the record." *Thomas*, 278 F.3d at 957.  Such independent reasons may include laboratory test results or contrary reports from examining physicians, and plaintiff's testimony when it conflicts with the treating physician's opinion.  *Lester*, 81 F.3d at 831 (citing *Magallanes*, 881 F.2d at 751-55).

### iii.  Analysis

Here, the crux of Plaintiff's argument is that the ALJ improperly evaluated the medical record because he failed to accord the physicians' opinions appropriate weight, and did not include social limitations in the RFC despite finding Plaintiff had moderate social limitations at step three of the disability analysis. She further asserts that the ALJ improperly discounted Dr. Patalano's opinion limiting Plaintiff to low stress work because her symptoms could temporarily undermine her cognitive efficiency, and that she could not sustain stressful interaction with the public or co-workers. Finally, Plaintiff contends that the ALJ's RFC of limiting Plaintiff to simple repetitive tasks does not encompass all of  Dr. Farrell's opinions that Plaintiff would have difficulty in high stress work settings, that she would be limited in frequent changes to routines, and that episodic exacerbations in anxiety or depressive symptoms would  temporarily undermine her cognitive efficiency.  AR 111-112.  In opposition, the Commissioner argues that the ALJ's RFC limiting Plaintiff to simple repetitive tasks with only limited superficial interaction addresses all of these limitations.

As a preliminary matter, the Court is not persuaded by Defendant's argument that the ALJ's RFC of limiting Plaintiff to simple repetitive tasks with only limited superficial interaction adequately addresses all of Plaintiff's limitations. (Doc. 17, pgs. 10-12).  As Plaintiff correctly notes, the ALJ only limited Plaintiff to performing simple repetitive tasks *not* simple repetitive tasks *with only* superficial interaction.  AR 27.  Therefore, the Court has not considered the

15

Commissioner's arguments regarding the superficial interaction limitation as this characterization misrepresents the ALJ's findings.

Notwithstanding the above, the Court is not persuaded by Plaintiff's argument that the ALJ improperly evaluated the medical evidence, specifically, that he erred in rejecting Dr. Patalano's opinion. Because Dr. Patalano was a non-examining psychologist, the ALJ may discount this opinion by providing a specific and legitimate reason for doing so. *Lester*, 81 F.3d at 830. In this case, the ALJ gave no weight to Dr. Patalano's opinion because the evaluation was completed during her prior disability application in 2009, and the doctor did not have the benefit of reviewing all of Plaintiff's most recent medical records. AR 27. The RFC is the most a claimant can do despite her limitations, and is based on all of the relevant medical evidence in the record. 20 C.F.R. § 404.1545(a); 20 C.F.R. § 416.945(1). Therefore, failing to review the most recent medical data is a specific and legitimate reason for not giving Dr. Patalano's opinion any weight. When evaluating Plaintiff's mental impairments, the ALJ only gave weight to Dr. Hedgepath's and Dr. Farrell's 2011 opinions. As such, the Court's analysis focuses on these doctors' opinions.

Upon a review of the record, the Court finds that the ALJ's formulation of Plaintiff's RFC is proper. In her arguments, Plaintiff ignores the fact that when evaluating the medical opinions and formulating the RFC, the ALJ clearly gave "substantial" weight (AR 27) to Dr. Hedgepath's opinion because the report was based on a thorough, well-documented examination, which is a specific and legitimate reason to adopt the doctor's findings. AR 27. In the report, Dr. Hedgepath found that there was no indication that Plaintiff's psychiatric symptoms would cause difficulty in understanding, remembering, and following instruction in the workplace. AR 831. Dr. Hedgepath also noted that although Plaintiff prefers to work alone, she has shown an ability to work with others such as working with the elderly, and that Plaintiff should be able to manage the normal pressures of the workday. AR 831. The Court recognizes that the ALJ also gave "weight" to Dr. Farrell's opinion, noting that it is consistent with Dr. Hedgepath's findings. AR 27. In doing so, the ALJ noted that Dr. Farrell opined Plaintiff was capable of performing very short and simple instructions. AR 27.

16

The Court construes the ALJ's decision as giving the greatest weight to Dr. Hedgepath's opinion that Plaintiff would not have difficulty functioning in the workplace. However, he also acknowledged Dr. Farrell's finding that Plaintiff could perform short and simple instructions. Dr. Farrell came to this conclusion even after considering all of the other conclusions in his report. Therefore, the ALJ's RFC limiting Plaintiff to simple repetitive tasks adequately addresses all of the doctors' limitations.

The Court is not persuaded by Plaintiff's argument that the ALJ's interpretation of Dr. Farrell's opinion is in error because the ALJ failed to accept and/or reject all of the limitations contained in the report, specifically, that Plaintiff would have difficulty in high stress work settings, that she should be limited in frequent changes to routines, and that episodic exacerbations in anxiety or depressive symptoms would temporarily undermine her cognitive efficiency. Even *assuming arguendo* that the ALJ should have been more specific and clearly indicated whether he adopted these limitations, any error is harmless because limiting the Plaintiff to performing simple routine tasks addresses all of Dr. Farrell's limitations. *Molina v. Astrue*, 674 F. 3d 1104, 1122 (9th Cir. 2012) (ALJ error is harmless where it does not alter the ultimate non-disability determination). An ALJ is not required to adopt the exact wording of a physician, but may translate mental limitations into concrete restrictions. *Stubbs-Danielson v. Astrue*, 539 F.3d 1169, 1174 (9th Cir. 2008) (explaining how an ALJ may translate mental limitations into concrete restrictions where the ALJ's assessment is consistent with restrictions identified in the medical testimony).

Here, limiting Plaintiff to simple repetitive tasks creates a low stress work setting that would limit changes in her work routine, and accommodate her psychiatric symptoms that may negatively impact on her cognitive functioning. It is reasonable to expect that simple and repetitive jobs are low stress and would be the type of work a person could perform even when experiencing some psychological symptoms - the work does not require concentration and attention to numerous and changing variables. *Henshaw v. Colvin*, 2016 WL 541408, at *14-17 (E.D. Cal. Feb. 11, 2016); *see also*, *Vezina v. Barnhart*, 70 Fed. Apps. 932 (9th Cir. 2003) (in response to a hypothetical restricting plaintiff to law-stress work, vocational expert listed jobs

17

1  involving simple, repetitive, unskilled tasks); *Keller v. Colvin*, 2014 WL 130493 (E.D. Ca. Jan.

2  14, 2014) (finding a RFC limiting Plaintiff to unskilled work captured opinion limiting plaintiff to

3  among other things, simple tasks in low-stress setting.)  Moreover, Plaintiff has not proposed an

4  RFC that would more effectively encompass Dr. Farrell's findings than the one formulated by the

5  ALJ.

6       Finally, there is no requirement that the ALJ's RFC finding be based on, or consistent

7  with, one medical opinion. Determination of a claimant's RFC is not a medical opinion, but a

8  legal decision that is expressly reserved to the Commissioner. See 20 C.F.R. §§ 404.1527(d)(2),

9  416.927(d) (RFC is not a medical opinion), 404.1546(c), 416.946(d) (identifying the ALJ as

10  responsible for determining RFC). "It is clear that it is the responsibility of the ALJ, not the

11  claimant's physician, to determine residual functional capacity." *Vertigan v. Halter*, 260 F.3d

12  1044, 1049 (9th Cir. 2001).  In this case, the ALJ's RFC is proper in light of the various weight

13  he accorded the medical opinions.

14       **B.  The ALJ Assessment of  Plaintiff's Medical Impairments is Not Supported by Substantial Evidence.**

15

16       Plaintiff argues that the ALJ erred by failing to order a physical consultative examination

17  despite voluminous medical records that she suffers from neck, low back, and knee pain. In

18  particular, Plaintiff contends that Plaintiff has significant treatment for lumbar spinal pain

19  stemming for her herniated discs, and has arthritis in her knee.  Instead of ordering a consultative

20  exam, the ALJ gave considerable weight to Dr. Knisely's opinion, a non-examining physician,

21  who, on August 12, 2011, determined that Plaintiff could lift 20 pounds occasionally and 10

22  pounds frequently, and that she could sit, stand, and walk 6 hours in an 8-hour day.  AR 27; 110-

23  111; 124-125. Plaintiff argues this is problematic because records from Dartmouth-Hitchcock

24  Medical Center, which included the most recent MRI of her back, were not produced until August

25  17, 2011, five days after Dr. Knisely's assessment.  Moreover, Plaintiff contends that the ALJ's

26  analysis of her obesity was improper as the record clearly establishes that her obesity affects her

27  functional capacity. (Doc. 16, pgs. 21-23).

28       In opposition, the Commissioner argues that a consultative examination was not warranted

because the medical record was not ambiguous or inadequate. Defendant contends that the ALJ reviewed numerous treatment records and assessments from state agency evaluators that provided the basis for the RFC.  Moreover, the ALJ's assessment of Plaintiff's obesity was proper because there was no evidence that Plaintiff's obesity prevented Plaintiff from working.

It is clear that agency doctors were aware that as of October 21, 2010, Plaintiff alleged she had four herniated discs in her lower back. AR 102.  She also reported worsening of the condition on March 13, 2011. AR 103.  Agency doctors were also aware of the issues Plaintiff was experiencing with her knee and feet. AR 99, 108.  Notwithstanding the above, on August 12, 2011, Dr. Knisely concluded that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently, and that she could sit, stand, and walk 6 hours in an 8-hour day.  AR 110-111; 124-125.  In doing so, he noted Plaintiff showed mild degenerative disc disease, which should improve with weight loss and physical therapy.  AR 110-111; 124-125.  Plaintiff was found to be only partially credible because her alleged limitations were out of proportion with the objective medical findings.  AR 110-111; 124-125.

Because formulation of the RFC is a function delegated to the Commissioner, the ALJ could have relied on Dr. Knisely's report when determining Plaintiff's RFC if the medical record had been complete at the time of Dr. Knisely's assessment. However, a close review of the administrative record reveals that although some of the records from Dartmouth Medical Facility were in the file, not all of the records requested from that facility had been received at the time of Dr. Knisely's report. AR 103-105; 107.  The State of Vermont Disability Determination Services requested the information from Dartmouth Medical Center on July 19, 2011, but copies of the medical records were not reproduced until August 17, 2011, five days after Dr. Knisely rendered his opinion.[6]  AR 859-1025. This is problematic because these records contain the most recent MRI of Plaintiff's back taken on June 30, 2011. AR 1008. The Commissioner has not addressed Plaintiff's argument on this issue, and the Court was not able to locate records that any doctor interpreted these test results before Plaintiff moved from Vermont, or as part of the RFC analysis.

---

[6] The bottom of each page of the medical records from this facility states the following : "Printed on August 17, 2011 7:26 AM Electronic Reproduction of  Legal Medical Record."

In general, it is the duty of the claimant to prove to the ALJ that she is disabled. 20 C.F.R. § 404.1512(a).  To this end, she must bring to the ALJ's attention everything that supports a disability determination, including medical or other evidence relating to the alleged impairment and its effect on her ability to work.  *Id*.  However, the ALJ has an independent duty to fully and fairly develop a record in order to make a fair determination as to disability, even where the claimant is represented by counsel. *See Celaya v. Halter*, 332 F.3d 1177, 1183 (9th Cir. 2003); *see also Tonapetyan v. Halter*, 242 F.3d 1144, 1150 (9th Cir. 2001); *Crane v. Shalala*, 76 F.3d 251, 255 (9th Cir.1996) (citing *Brown v. Heckler*, 713 F.2d 441, 443 (9th Cir. 1983)). Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to "conduct an appropriate inquiry." *See Tonapetyan*, 242 F.3d at 1150.

In this case, Plaintiff's most recent MRI of her back and other medical records were not reproduced and placed in the file until after all of the state agency doctors made their assessments. Although the ALJ clearly considered these records as part of his decision (AR 24), he did so without the benefit of a medical opinion interpreting the results.  Therefore, the ALJ's formulation of the Plaintiff's RFC of her physical impairments is not based on substantial evidence. Accordingly, the case will be remanded to the agency so that a doctor may review the complete medical file, and propose an RFC that encompasses all of Plaintiff's limitations.  In light of the medical evidence in this case, the Court will leave it to the ALJ's discretion to determine whether a consultative examination is required to complete this process.

Finally, Plaintiff argues that the ALJ improperly evaluated the effects of her obesity. An evaluation of the ALJ's consideration of Plaintiff's obesity is dependent on the weight the ALJ accords the medical evidence.  Accordingly, if different a medical opinion is rendered on remand, the ALJ's obesity analysis may also change.  However, based on the record currently before the Court, the ALJ's analysis of Plaintiff's obesity is supported by substantial evidence.

An ALJ is required to consider an individual's obesity at steps two through five of the sequential disability evaluation. SSR 02-1p, 2002 WL 34686281 (2002).  Moreover, obesity must be considered in combination with the individual's other impairments. *Id*.  SSR 02-1p directs that

1  "[the ALJ] will not make assumptions about the severity or functional effects of obesity
2  combined with other impairments." *Id.*  Rather, "[the ALJ] will evaluate each case based on the
3  information in the case record." *Id.* When the record does not contain evidence of functional
4  limitation due to obesity, or indicate that obesity exacerbated other impairments, the ALJ is not
5  required to consider obesity in combination with other impairments. *Burch v. Barnhart*, 400 F.3d
6  676, 682 (9th Cir. 2005); *see also Garcia v. Comm'r of SSA*, 498 Fed. Appx. 710, 712 (9th Cir.
7  2012) (the ALJ's finding that obesity did not affect the RFC was proper where the Plaintiff "did
8  not provide any evidence of functional limitations due to obesity which would have impacted the
9  ALJ's analysis") (internal quotation marks omitted); *Hoffman v. Astrue*, 266 Fed. Appx. 623, 625
10  (9th Cir. 2008) ("The ALJ's failure to consider Hoffman's obesity in relation to his RFC was
11  proper because Hoffman failed to show how his obesity in combination with another impairment
12  increased the severity of his limitations.").

13  In this case, the ALJ noted that Plaintiff weighs 289 pounds, is 5 feet 4 inches tall, and
14  that she is morbidly obese. AR 25. The ALJ found Plaintiff's obesity was a severe impairment,
15  however, he noted that although it is likely that the obesity contributed to her discomfort, no
16  evidence showed that it precluded work activities. AR 23; 27.  Moreover, in her brief, Plaintiff as
17  not articulated any functional limitations a doctor has imposed because of her obesity, or
18  demonstrated that her obesity exacerbated other impairments.  Under these circumstances, the
19  ALJ was not required to consider Plaintiff's obesity in combination with other impairments.
20  Therefore, the ALJ's consideration of obesity based on the current record is without legal error
21  and is supported by substantial evidence.

22  **C. The ALJ's Credibility Analysis**

23  Plaintiff has argued that the ALJ's credibility determination is improper.  Similar to the
24  obesity analysis, because the Court remands this case for renewed consideration of the medical
25  evidence, the Court dispenses with an exhaustive analysis of the ALJ's assessment of Plaintiff's
26  credibility. Consideration of Plaintiff's credibility is inescapably linked to conclusions regarding
27  the medical evidence.  20 C.F.R. § 416.929.  As such, the Court will not address Plaintiff's
28  credibility arguments with specificity.

However, generally, the Court notes that a two-step analysis applies at the administrative level when considering a claimant's credibility. *Treichler v. Comm. of Soc. Sec.*, 775 F. 3d 1090, 1098 (9th Cir. 2014). First, the claimant must produce objective medical evidence of his or her impairment that could reasonably be expected to produce some degree of the symptom or pain alleged. *Id.* If the claimant satisfies the first step and there is no evidence of malingering, the ALJ may reject the claimant's testimony regarding the severity of his or her symptoms only if he or she makes specific findings and provides clear and convincing reasons for doing so. *Id.*; *Brown-Hunter v. Colvin*, 806 F.3d 487, 493 (9th Cir. 2015); SSR 96-7p (ALJ's decision "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight."). In particular, when there is evidence of an underlying medical impairment, the ALJ may not discredit the claimant's testimony regarding the severity of his or her symptoms solely because they are unsupported by medical evidence. *Bunnell v. Sullivan*, 947 F.2d 341, 343 (9th Cir. 1991); SSR 96-7. Moreover, general findings are insufficient; rather, the ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. *Brown-Hunter*, 806 F. 3d at 493.

Here, the ALJ notes that the Plaintiff's medically determinable impairments could reasonably cause the alleged symptoms, but her statements regarding the intensity, persistence, or functionally limiting effects of the pain are not credible. However, the ALJ does not summarize Plaintiff's testimony or identify which part of Plaintiff's testimony he does not find credible. AR 27-28. Moreover, although he notes that Plaintiff's mental impairments respond well to medication, the rest of the reasons for discrediting Plaintiff relate to a lack of objective proof in the medical record. On remand, if after considering the new medical opinion, the ALJ again finds Plaintiff's testimony not credible, he shall clearly indicate which testimony he does not believe, and provide reasons in addition to the lack of objective medical evidence to properly substantiate his credibility determination.

## VI.    REMAND FOR FURTHER ADMINSTRATIVE PROCEEDINGS

Given the above, the Court must determine whether this action should be remanded to the

22

1  Commissioner with instructions to immediately award benefits or whether this action should be

2  remanded to this Commissioner for further administrative proceedings.  Remand for further

3  proceedings is appropriate when an evaluation of the record as a whole creates serious doubt as to

4  whether the claimant is in fact disabled. *Garrison v. Colvin,* 759 F. 3d 995, 1021 (9th Cir. 2014).

5  Conversely, a court should remand with for an award of benefits when: (1) the record has been

6  fully developed and further administrative proceedings would serve no useful purpose; (2) the

7  ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant

8  testimony or medical opinion; and (3) if the improperly discredited evidence were credited as

9  true, the ALJ would be required to find the claimant disabled on remand.  *Id*. at 1020. Even if all

10  three of these criteria are met, the Court can retain flexibility in determining an appropriate

11  remedy.  *Brown-Hunter v. Colvin*, 806 F. 3d 487, 495 (9th Cir. 2015).

12          In this case, the ALJ's RFC regarding Plaintiff's physical impairment is not supported by

13  substantial evidence because the non-examining doctors did not have a complete medical record

14  when they formulated the RFC. The Court finds that remand for further administrative

15  proceedings is necessary so that Plaintiff's physical limitations can be evaluated in light of this

16  additional evidence. As part of the process, the ALJ shall determine whether a consultative

17  examination is necessary, or whether the non-examining agency doctor can sufficiently assess

18  Plaintiff's limitations. The ALJ shall amend his analysis of Plaintiff's obesity and his credibility

19  determination given the new medical opinions as needed.

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**VII.   CONCLUSION**

Based on the foregoing, the Court finds that the ALJ's decision that the Plaintiff is not disabled as defined by the Social Security Act is not supported by substantial evidence in the record as a whole, and is not based on proper legal standards.  Accordingly, this Court GRANTS Plaintiff's appeal from the administrative decision of the Commissioner of Social Security.  The Clerk of this Court is DIRECTED to enter judgment in favor of Plaintiff, Elizabeth M. Sawyer, and against Carolyn W. Colvin, the Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **March 28, 2016**              /s/ _Erica P. Grosjean_
                                    UNITED STATES MAGISTRATE JUDGE